UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DENNIS CORNETT, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 13-145-GFVT |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| MAGNUM HUNTER PRODUCTION, | ) | **ORDER** |
| INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Cornetts, Middletons, and Begleys, on behalf of themselves and a proposed class of similarly situated individuals, claim that, in producing and selling the natural gas taken from their land at a price that renders no royalties, Magnum Hunter Production Inc., has committed waste under KRS 381.350.[1]  As such, the Plaintiffs seek cancellation of the lease and treble damages.  Magnum Hunter moves the Court to dismiss this claim on the grounds that the statute does not apply to oil and gas lessees, and even if it does, the company has done nothing to trigger it and the leases themselves bar the claims.  Because the Court finds that the oil and gas leases provided special written permission for Magnum Hunter to produce natural gas and sell it for the market price at the well, Magnum Hunter's motion shall be **GRANTED** and the Plaintiffs' claims under the Kentucky waste statute shall be **DISMISSED**.

---

[1] According to Magnum Hunter's Notice of Removal, the proposed class includes an excess of 1,000 people with an aggregated amount in controversy of over $19,000,000.  Further, four of the named plaintiffs are diverse from Magnum Hunter, which is deemed a Kentucky citizen.  The plaintiffs have not disputed these representations or that these facts satisfy the jurisdictional requirements of 28 U.S.C.A. § 1332(d).

I

The named Plaintiffs in this action are all land owners who entered into a series of oil and gas leases with Magnum Hunter Production, Inc., between 2003 and 2007 in Harlan and Letcher counties. In exchange for a sum of money and the various covenants and agreements contained in the lease, each Plaintiff leased the relevant land to Magnum Hunter for, among other things, "the purpose of mining exploring by geophysical and other methods, and operating for and producing therefrom oil, gas, [and] casing-head gas…" [R. 1-1 at 14, 24, 32]. Those additional covenants and agreements included a provision describing royalties for gas that Magnum Hunter would pay the Plaintiffs in further consideration for the lease. In terms of the Cornett and Middleton leases, Magnum Hunter agreed "to pay Lessor one-eighth of the market price at the well for gas sold or for the gas so used from each well off the premises…" [R. 1-1 at 14, 24]. In the Begley lease, Magnum Hunter agreed "to pay Lessor one-eighth of the net proceeds realized by the Lessee from the sale of natural gas…which net proceeds shall be defined to be the actual proceeds received less the Lessor's proportionate part of all post-production costs incurred by Lessee downstream of the wellhead to and including the point of sale, including but not limited to, cost incurred in the gathering, compression (including fuel burn), treating, processing, transporting, and marking of such gas…" [R. 1-1 at 33]. Each lease was to run for a set period of time, "and as long thereafter as oil, natural gas, coalbed methane gas, occluded gas, and other naturally occurring gases…are produced from the said lease premises…" [R. 1-1 at 32; similar provisions at R. 1-1 at 14, 24].

From all indications, this arrangement proved mutually beneficial for the primary term of the lease, as well as several years into the secondary term. However, beginning in 2012, the

Plaintiffs no longer received royalty payments, but instead were provided with "Revenue Summary Statements," and "Accounts Receivable Summary Statements," reflecting they owed Magnum Hunter certain sums of money for their proportionate part of the difference between the amount for which such gas was sold and the deduction taken for transportation costs. [R. 1-1 at 5]. According to Magnum Hunter, the reason that no royalties were paid is because, "the price of natural gas has declined, such that the post-production costs described may have exceeded the price of gas Magnum Hunter has received in some instances," which means that "after the Plaintiffs' one-eighth share of post-production costs is assessed, no proceeds remain on which royalties can be paid." [R. 3-1 at 4]. Magnum Hunter notes that during this period in question, it has not been receiving any profits either.

On June 21, 2013, the Plaintiffs initiated this action in Harlan Circuit Court, on their own behalf and on behalf of a large number of others similarly situated. [R. 1-1 at 3]. The Plaintiffs do not dispute that the price of natural gas has fallen or that Magnum Hunter is not profiting from the sale of natural gas. Further, the Plaintiffs do not specifically claim that Magnum Hunter has breached the leases. Instead, the Plaintiffs argue that in continuing to remove natural gas from their land and sell it at a price that does not allow it to recover its costs and pay the Plaintiffs a royalty, Magnum Hunter has violated Kentucky's waste statute, KRS 381.350. As relief, the Plaintiffs seek cancellation of the lease and treble damages. The Plaintiffs also petition the Court for a declaration that they do not have to pay the costs for which Magnum Hunter has billed them. Magnum Hunter responds that the charges assessed to the Plaintiffs were computer generated and that the company has no intention of collecting them. In addition, Magnum Hunter argues that the Kentucky waste statute does not apply in this case. As a result,

Magnum Hunter believes that the Plaintiffs have failed to state a claim for which relief could be granted, and their complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Having been fully briefed by the parties, this matter is now ready for the Court's review.

II

A

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a complaint which fails to state a claim upon with relief can be granted. Fed.R.Civ.P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, the Court "accept[s] all the Plaintiffs' factual allegations as true and construe[s] the complaint in the light most favorable to the Plaintiffs." *Hill v. Blue Cross & Blue Shield of Mich.,* 409 F.3d 710, 716 (6th Cir. 2005). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993).

B

As a general matter, waste is "[p]ermanent harm to real property committed by a tenant (for life or for years) to the prejudice of the heir, the reversioner, or the remainderman." Black's Law Dictionary (9th ed. 2009); *see also Calvert v. Rice,* 12 Ky.L.Rptr. 252, 253, 1890 WL 1368 (Ky. Super. May 14, 1890) (defining waste as "an act done by a tenant without license or authority from his landlord, whereby a lasting damage is done to the freehold."). The doctrine of waste is most often applied to a situation in which a person with a present interest in property unreasonably interferes with the future enjoyment of the premises by someone with a future interest. 1 Summers Oil and Gas § 2:25 (3d ed.). For example, someone with a future interest might successfully maintain an action for waste against a life tenant who cuts down all of the

trees from the property or affirmatively alters the structure of a building so as to reduce its value. *See* 3 Blackstone, Commentaries, p. 223 (describing waste as "spoil or destruction of the estate, either in houses, woods, or lands, by demolishing, not the temporary profits only, but the very substance of the thing."); *Adams v. Adams*, 371 S.W.2d 637, 639 (Ky. 1963); *Abel v. Wuesten*, 136 S.W. 867 (1911).

Kentucky has codified the waste doctrine in KRS 381.350, and the parties do not dispute that this statute is the appropriate law to be applied in this case. Specifically, the Kentucky waste statute provides as follows:

> If any tenant for life or years commits waste during his estate or term, of anything belonging to the tenement so held, without special written permission to do so, he shall be subject to an action of waste, shall lose the thing wasted, and pay treble the amount at which the waste is assessed.

KRS § 381.350. Though Kentucky courts trace the origins to this statute to the Thirteenth Century English Statute of Gloucester, the parties have been unable to produce a single case wherein this statute has ever been applied to forfeit an oil and gas lease for failure of the lessee to generate sufficient royalties for the lessor. *See Salyer's Guardian v. Keeton*, 214 Ky. 643, 283 S.W. 1015, 1018 (1926). Magnum Hunter argues that the reason for this absence of law is that the statute could never apply in such a situation, and it asks the Court to interpret the statute accordingly. Specifically, Magnum Hunter claims that this statute is not applicable because an oil and gas lessee is not a "tenant for life or years," selling oil at market price pursuant to a lease is not waste, and the claim is barred by the lease itself.

When interpreting state statutes, federal courts sitting in diversity are bound by the construction given the statute by the highest court in the state. *Senn v. Tile Layers Protective*

*Union,* 301 U.S. 468, 477 (1937); *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 240 (6th Cir. 2011) (citations omitted). The Kentucky Supreme Court has stated that, "where the language of a statute is clear and unambiguous on its face, we are not free to construe it otherwise even though such construction might be more in keeping with the statute's apparent purpose." *MPM Fin. Grp., Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky. 2009) (*Whittaker v. McClure,* 891 S.W.2d 80, 83 (Ky.1995)). In the absence of direct state Court precedent, the Court must make its best prediction of what the Kentucky Supreme Court would do if it were confronted with the issue. *Poplar Creek Dev. Co.*, 636 F.3d at 241 (citing *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.,* 493 F.3d 752, 755 (6th Cir.2007)). Here, it is unnecessary for the Court to make the sort of sweeping predictions requested by Magnum Hunter because it is clear from the text and the consistent recognition by Kentucky courts that the waste statute precludes recovery in the presence of special written permission to engage in the activity allegedly constituting waste.

Though Kentucky courts have seldom had occasion to consider the waste statute in recent years and apparently have never considered it in this context, the state courts have traditionally had much to say about waste. In *Abel v. Wuesten*, the plaintiff leased two buildings to the defendants, and the lease required that the buildings be kept in good condition and not used in such a way that would increase the insurance premiums. 133 S.W. 774 (1911). The plaintiff was also to be consulted before changes were made. *Id*. at 775. The defendants sublet the buildings to a third party, who began the process of converting the building into a "moving picture theatre." *Id*. at 774-775. At the time of the litigation, the building's window frames had been torn out, the plastering had been removed from the floors and the ceiling, and the partitions had

been torn down. *Id*. at 775. As a result of the alterations, there was an increase in the rate of insurance and it would have taken some expense to restore the building to its former state. *Id*. The court initially found no waste, citing, among other reasons, that evidence in the record suggested that the plaintiff had consented to the changes. *Id*. However, upon rehearing, the court reversed course and found that the alterations did constitute waste. In making this finding, the court quoted the waste statute and noted as follows:

> *By this section a special license in writing is necessary in order to authorize the tenant for life or years to commit waste, and without such special license in writing he is subject to an action of waste.* In this case appellant did not consent in writing to the waste committed by the appellees. His consent was oral, and does not, therefore, afford appellees any protection. Notwithstanding appellant's oral consent, they are still liable to an action of waste; and, being liable to an action of waste, the lease may be forfeited on the ground of waste.

*Abel v. Wuesten*, 136 S.W. 867 (1911) (emphasis added); *see also*, *Adams*, 371 S.W.2d at 639 (Ky. 1963) (citing *Abel* and recognizing the importance of considering whether the defendant had secured written permission or consent to engage in the conduct in question.). Thus, while the court ultimately found that the actions of the defendants constituted waste, it also recognized that when a party consents in writing to the actions that he later claims to be waste, he cannot recover under the waste statute.

In *Mullins v. Dees*, the plaintiff leased the defendant the coal on certain land in exchange for the payment of royalties. 124 S.W. 828 (Ky. 1910). The plaintiff later sued the defendant, claiming that he had not operated the mine continuously, refused to pay the royalty, and his operation had damaged the mine. *Id*. The court expressly found that the defendant was "operating the mine in such a way as to ruin it." *Id*. at 829. The court then quoted the waste statute, which essentially tracks the language of the modern version, and offered the following

analysis:

> Section 2328, Ky. St. (Russell's St. § 291), provides: "If any tenant for life or years shall commit waste during his estate or term, of anything belonging to the tenement so held, without special license, in writing, so to do, he shall be subject to an action of waste, shall lose the thing wasted, and pay treble the amount at which the waste shall be assessed." Mullins was a tenant for years; he had plainly committed waste. The thing wasted was the mine. The course he was pursuing would soon render it absolutely useless. *He was not using the mine in the way contemplated by his lease*, but was simply misusing and destroying the property.

*Id.* (emphasis added). The court permitted recovery under the statute because Mullins was a tenant for years, committed waste in his destruction of the mine, and these actions were not authorized by the lease. The clear implication of the analysis is that, if the defendant had caused the waste by operating the mine in a manner consistent with the lease, then the lease would have operated as special written permission and precluded recovery under the statute.

Even if Magnum Hunter could be considered a tenant for years, and even if its production of gas when it cannot be sold for a profit could be considered waste, the prime difference between this case and those cited is that the alleged waste herein takes the form of conduct that was contemplated and expressly permitted by the Plaintiffs in the written leases. The leases tendered along with the complaint, authorize Magnum Hunter to remove and sell gas from the relevant property, but make no guarantees that the sale will be profitable or that the Plaintiffs will receive royalty payments. Instead, as part of the lease, Cornett and Middleton contracted with Magnum Hunter to pay them "one-eighth of the market price at the well for gas sold or for the gas so used from each well off the premises…" [R. 1-1 at 14, 24]. A similar provision was recently discussed by the Kentucky Court of Appeals in *Baker v. Magnum Hunter Prod., Inc.*, wherein the court noted that several federal courts sitting in diversity had found that Kentucky

follows the "'at-the-well' rule, which permits a lessee to deduct the costs of gathering, compression and treatment prior to determining the market value of the gas before apportioning the appropriate royalties." 2012-CA-001016-MR, 2013 WL 3235832, at *2 (Ky. Ct. App. June 28, 2013) (citing *Poplar Creek Dev. Co.,* 636 F.3d 235; *Appalachian Land Co. v. EQT Prod. Co.,* 2012 WL 523749 (E.D.Ky. Feb. 16, 2012); *Thacker v. Chesapeake Appalachia,* 695 F.Supp.2d 521 (E.D.Ky.2010); *In re KY USA Energy, Inc.,* 448 B.R. 191 (Bankr.W.D.Ky.2011)). Further, the court expressly defined "market value at the well" as "'[t]he value of oil or gas at the place where it is sold, minus the reasonable cost of transporting it and processing it to make it marketable." *Id.* at 2 (citing Black's Law Dictionary 1085 (9th ed.2011)). The terms of this agreement are made even more direct in Begley's lease, wherein the parties expressly agreed that Magnum Hunter would pay the Begleys, "one-eighth of the net proceeds realized by the Lessee from the sale of natural gas…which net proceeds shall be defined to be the actual proceeds received less the Lessor's proportionate part of all post-production costs incurred by Lessee downstream of the wellhead to and including the point of sale, including but not limited to, cost incurred in the gathering, compression (including fuel burn), treating, processing, transporting, and marking of such gas…" [R. 1-1 at 33].

The terms of the leases clearly do not require that Magnum Hunter pay the Plaintiffs a flat rate royalty based on the amount of natural gas that is removed from the land. Conceivably, the parties could have contracted in this manner had it been their intent. Instead, the Plaintiffs agreed to accept a percentage of the market value of the gas less certain costs. Implicit in this arrangement is the shared risk between the parties that the costs of production might exceed the market value of the natural gas. In such cases, Magnum Hunter would earn no profit and the

Plaintiffs would receive no royalties. The parties undoubtedly hoped that this would not happen, but did not craft the lease in such a manner to foreclose the possibility that it would. Thus, Magnum Hunter is doing nothing that the Plaintiffs have not given it special written permission to do, and as a result, its conduct is excepted from the Kentucky waste statute.

The Plaintiffs do not seriously contend that this is not the meaning of the royalty provisions of the lease, and in fact, have not even asserted a claim against Magnum Hunter for breach of contract. Instead, the Plaintiffs have argued that Magnum Hunter should have taken advantage of its options under the shut-in royalty and force majeure clauses. All three leases included a shut-in royalty provision, under which, in the words of the Plaintiffs, "MHP is granted the right to shut-in such wells when the 'market is lost or ceases,' pay a shut-in royalty of $1.00 per acre, and the Lease(s) will not expire." [R. 4 at 9 (citing R. 1-1 at 16, 26, 35)]. Further, the Begley lease contains a force majeure clause, which indicates that the lease will not terminate due to "the inability to obtain a satisfactory market." [R. 1-1 at 36]. There are, however, two problems with the Plaintiffs' argument. First, the clear purpose of these provisions were not to preserve the gas or ensure royalties, but to provide Magnum Hunter a mechanism to keep the lease from terminating even if gas was not being produced from the well. Additionally, even as acknowledged by the Plaintiffs, the leases gave Magnum Hunter the right, not the requirement, to shut in the gas wells during lean market times. Thus, the presence of these provisions do not show that Magnum Hunter was operating outside the scope of the lease when it continued to produce and sell gas despite the fact that the transaction rendered no profit or royalty.

The more compelling argument made by the Plaintiffs is that Kentucky case law imposes an affirmative duty on gas lessees to produce gas in a manner that generates royalty payments for

the lessor.  In support of this position, the Plaintiffs cite cases such as *Delta Gas Corp. v. Thompson*, which notes that "the payment of a reasonable royalty is the object of leasing oil and gas rights." 951 F.2d 348, at *4 (6th Cir. 1991) (unpublished table decision).  In *Delta Gas*, the Sixth Circuit relies on *Cumberland Contracting Co. v. Coffey*, which further explains this statement:

> The general rule, however, is to hold the expression oil well or gas well, as used in a lease contract, to mean an oil well or gas well which can be profitably operated as such. Recognizing that the payment of a reasonable royalty, considering all circumstances in each case, is the object of leasing oil and gas rights, the court in Flanagan v. Marsh, 105 S.W. 424, 32 Ky.Law.Rep. 184, stated: (T)he lessee will not be permitted to hold the land for speculative or other purposes an unreasonable length of time for a mere nominal rent, when a royalty on the product is the chief object in the execution of the lease.

405 S.W.2d 553, 555-56 (Ky. 1966) (internal quotation marks omitted).

And while, on the surface, these statements would appear to support the Plaintiffs' argument, drilling down into the cited cases reveal that these statements were made in under circumstances that are quite opposite from those present here.  In each case cited by the Plaintiffs, the lessor claimed that the lessee was not producing oil or gas in the time or quantities contemplated in the lease, resulting in a failure to generate sufficient royalties and a necessity to cancel the lease. *Delta Gas Corp.*, 951 F.2d at *4 n. 2 (noting that use of gas by plaintiffs' son did not constitute production in profitable quantities); *Cumberland Contracting Co.*, 405 S.W.2d at 556 ("because of lessee's inability or failure to produce oil in sufficient quantity so as to pay the lessor a reasonable rent (royalty), reasonable notice having been given, the lease has expired and in this sense was forfeited."); *McMahan v. Boggess*, 302 S.W.2d 592, 594 (Ky. 1957) (where the court cancelled the lease due to delays in developing the well and minimal production); *Hails*

*v. Johnson*, 204 Ky. 94, 263 S.W. 679, 680 (1924) (after minimal to no production of oil from a well, the court treated the leases as having been abandoned); *Flanagan v. Marsh*, 105 S.W. 424, 425 (Ky. 1907) (cancelling the lease due to delay in production, noting that the oil and gas was being drained from the land by adjoining land owners and the lessor could profit off of the land if it were being leased to someone who would develop it and actually produce oil and gas). The dispute in this case is not over whether Magnum Hunter has produced too little gas during a good market or has delayed too long, but whether the company is removing too much gas during a difficult market and should delay production for a period of time. These circumstances involve significantly different interests, and, as a result, the cited cases do not mandate the imputation of a new and unwritten covenant to this lease. The Plaintiffs have not provided the court with a single case in which the Kentucky courts have cancelled an oil and gas lease because, despite the best efforts of the lessee in producing and selling gas, the market renders him unable to produce a significant enough profit to provide the lessor with royalties. In the absence of such authority, this Court shall not disregard the clear words of the lease to find that Magnum Hunter's conduct was not permitted in writing by the Plaintiffs.[2]

Whether or not an oil and gas lessee could ever lose his lease and suffer treble damages for violation of the Kentucky waste statute, it is clear that the lessee in this case should not. Magnum Hunter agreed that it would produce oil and gas from the Plaintiffs' land and pay them

---

[2] Though perhaps implied in the claims, it is worth noting that the Plaintiffs have made no direct allegations that Magnum Hunter is acting in bad faith. In fact, the Plaintiffs do not dispute that Magnum Hunter has also made no profit for its efforts during this period. While it is true that Magnum Hunter has not offered a reason for why it continues to produce gas even though the practice is unprofitable, it takes no strain of an imagination to conceive of legitimate purposes why it might do so. Perhaps Mangum Hunter is fulfilling a volume contract or in need of the cash flow to maintain its operations so that when the market recovers it will be in position to take advantage of it. Whatever the reason, Magnum Hunter is not prohibited from unprofitably producing gas on the Plaintiffs' land by the waste statute because the lease allows it.

royalties in the amount one-eighth of the actual proceeds from the sale of natural gas less certain costs. The company has done just that. When the market allowed, the company turned a profit and remitted the appropriate royalty to the Plaintiffs. Under the current market conditions, Magnum Hunter has continued to produce, but the costs have exceeded the sale price such that no royalties could be provided to the Plaintiffs. Maybe that is waste – but even if it is, it is waste that the lease gives Magnum Hunter the written permission to commit. As such, Magnum Hunter's conduct is excepted from the scope of the Kentucky waste statute, and the Plaintiffs' complaint fails to state a claim upon which relief may be granted on this ground.[3]

C

In addition to their claim for waste, the Plaintiffs also seek a declaration that they do not have to pay a share of the transportation costs assessed them by Magnum Hunter. Magnum Hunter has responded the Plaintiffs received notice of these costs as a result of a computer print-out, which did not create an obligation on the part of the Plaintiffs. Further, Magnum Hunter agrees that the Plaintiffs should not have to pay these costs and represents that it will not attempt to collect these amounts from them. There being agreement between the parties on this claim, Magnum Hunter argues that it should be dismissed as well.

The Declaratory Judgment Act requires that there be an actual controversy. 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

---

[3] This is, of course, not to say that the Plaintiffs could never have any relief against Magnum Hunter for its conduct – only that such relief may not presently be had under the waste statute under which their claims were brought.

When evaluating whether a declaratory judgment action presents an actual controversy, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Bench Billboard Co. v. City of Covington, Ky.*, CIV.A. 06-75-DLB, 2010 WL 420064 at *11 (E.D. Ky. Feb. 1, 2010) (quoting *Golden v. Zwickler,* 394 U.S. 103, 108 (1969)).  Here, the Plaintiffs do not believe they should have to pay the costs assessed them, and Magnum Hunter agrees.  Thus, there is no actual controversy, and the Plaintiffs' claim under the Declaratory Judgment Act shall be dismissed.  However, in response to the Plaintiffs' concern that Magnum Hunter might later change its position and demand payment, the Court shall dismiss this claim without prejudice.

III

Accordingly, for the aforementioned reasons, it is hereby **ORDERED** as follows:

(1)      The Defendant's Motion to Dismiss [R. 3] is **GRANTED**;

(2)      Count I of the Plaintiffs' Complaint is **DISMISSED**;

(3)      Count II of the Plaintiffs' Complaint is **DISMISSED WITHOUT PREJUDICE**;

(4)      A separate **JUDGMENT** shall enter; and

(5)      This matter is **STRICKEN** from the Court's active docket.

This 31st Day of March, 2014



Signed By:

*Gregory F. Van Tatenhove*

**United States District Judge**